DECISION
This matter is before the court for decision after a jury-waived trial.
The controversy at hand emanates from a purchase and sale agreement entered into by plaintiff (seller) and defendant (buyer) on July 31, 1995.
The total purchase price for the unimproved parcel was $45,000, S20,000 of which buyer provided on the date the contract was executed, with the remaining $25,000 to be paid upon delivery of the deed. The parties concur that $13,655 of the latter sum remains unpaid. Buyer, asserting fraud and misrepresentation, maintains that "he owes nothing" and counterclaims that seller owes him $33,000 in damages.
Plaintiffs original intention was to prepare the land for and receive municipal approval for the construction of a three bedroom home. Although be hired an engineer, Joseph Riccio, to perform percolation tests, he did not seek a building permit until November of 1989. At some point after the permit issued, but before the execution of the sales agreement, Raposa excavated the site and poured a foundation. He subsequently covered the foundation, ostensibly because he decided to build on another parcel closer to the water.
Mr. Raposa testified that Kyle Welchman and his wife visited him at his home and expressed an interest in buying the lot. At the time of the closing in December of 1995, plaintiff was in. Florida. When he returned to Rhode Island, he spoke to the defendant regarding the balance of $20,000. They discussed the possibility of defendant, who was a skilled contractor, "working off" the debt on other properties owned by the defendant. Plaintiff maintains that defendant "worked off" only $6,345 of the balance.
Plaintiff, had furnished to all documents pertinent to the lot, including a building permit, "perc" test results, a copy of the house plan and a septic system design. Mr. Raposa did not remember telling defendant that the building permit was expired but stated that he "must have" and defendant "knew anyway because he is a contractor."
Mr. Welchman first met the plaintiff in June of 1995 through Mrs. Welchman. Defendant inquired of plaintiff whether the lot was suitable for the construction of a three bedroom dwelling and plaintiff replied "yes." Plaintiff provided defendant with Joseph Riccio's approved house and septic design, William Smith's reports concerning water table and percolation tests, and a 1989 building permit. When defendant went to get his own building permit, the day after the closing, he was informed that Smith's plan would have to be redone. William Smith, a civil engineer and septic system designer, confirmed that he had been hired by plaintiff to do work on the property in 1995. The approvals Smith secured, after soil tests, had expired and could not be utilized by defendant. Smith explained that it would be "difficult, if not impossible," to construct the house according to the original design on the eastern "uphill" portion of the lot. Defendant then engaged Smith to redesign the septic system in conformance with DEM requirements. In order to execute the new plan, it was necessary for defendant to hire an excavator. Mr. Louie Hedeiros testified that he began work on the site in October of 1996. Because of the steep slope of the lot from north to south, Mr. Medeiros had to install a foundation with 12 foot — instead of the customary 8 foot — walls. Mr. Medeiros also had to transport a substantial amount of fill to the site and build a stone retaining wall. His work on the septic system was completed in November of 1996. The total expenditure for the excavation work was $18,558.28.
The defendant presented the testimony of licensed real estate broker, W. Nancy Brady. She described the Welchman's two bedroom home as a "lovely Cape, in a very desirable setting, with a magnificent water view." She opined that the restriction to two bedrooms reduced the home's fair market value by 10 to 15%. She set the range of fair market value for the home at $209,000 to $219,000, noting an increased value for a three bedroom home of $229,000 to $234,000.
Defendant's wife, Mrs. Deborah Lyn Welchman, testified that she has known the plaintiff her entire life. He is her sister's godfather and she refers to him as "Uncle Billy." She corroborated her husband's testimony regarding their statements to plaintiff and plaintiffs assurance that everything was "all set" for the construction of a three bedroom house. She said they would never have purchased the house if they had known of the problems, and she felt that the plaintiff "gave [us] the shaft" Mrs. Welchman's father, Eugene J. LaJeunesse, also had a conversation with plaintiff in which plaintiff repeated that the lot was approved for the construction of a three bedroom home.
In rebuttal, plaintiff testified that the above-reported conversations never took place and that he never hired Smith or got test results from him. (Smith's testimony was in direct contrast).
Plaintiff now argues that he is entitled to be awarded $14,000 due on the balance of the purchase price. Defendant counters that he relied to his detriment upon statements of the plaintiff which plaintiff knew, or should have known, were false. Defendant seeks damages in The amount of $33,000, a sum which represents extra nannies defendant was forced to expend in order to construct a code compliant dwelling.
In order to sustain a cause of action in fraud, defendant must prove that at the time plaintiff uttered the statements in controversy he knew they were false and intended to deceive defendant. Such a claim is a tort action sounding in deceit and requiring some degree of culpability on the misrepresenter's part. Prosser, Law of Torts (3d ed.) § 100. On the other hand, in a contact-based claim, it does not matter whether the inducing misrepresentation was fraudulent negligent, or innocent as long as it was material. Halpert v. Rosenthal, 267 A.2d 730 (R.I. 1970). The equitable basis for this reasoning is that it would be unjust to permit a person who has made false representations, even innocently, to retain the fruits of a bargain induced by such representations. 12 Williston, Contracts § 1500 at 400-401.
There is but one issue in this lot purchace/house-building scenario which is clearly undisputed. Furthermore, it is supported by unimpeached expert testimony which the court finds totally credible. It is abundantly clear from the testimony of every witness, including the plaintiff who disputed nearly everything every, other witness had to say, that the Welchman's were intent upon building a three-bedroom home. All of the plans, plaintiff's and defendant's alike, demonstrate that nothing less was contemplated by either party. The court believes that Mr. and Mrs. Welchman testified truthfully and had a superior recollection of the events in controversy. Nonetheless, their testimony is not tantamount to proof that at the time plaintiff made the questioned statements he had a scheming and deceitful mindset. However, he cannot be relieved of responsibility for the material misrepresentation whether intentional, negligent; or innocent that the lot was suitable for three bedroom construction.
The credible evidence compellingly supports the conclusion that the young couple did not get what they bargained for, a lot upon which they could construct a three-bedroom dwelling. The ability to do the latter with the accompanying regulatory approval was the very reason they entered into this transaction. The uncontradicted testimony of Mrs. Brady, a licensed real estate broker with decades of experience, is that the fact that the home has only two bedrooms would cause 60 to 75% of the buyer's market to fall away. While some buyers would purchase a two bedrooms with a view towards adding a third bedroom, such an accommodation would be impossible here because of regulatory restrictions. The average fair market value of the borne with two bedrooms is $214,000 and with three bedrooms, $231,500. This represents a diminution in the fair market value, and a net loss to the Welchmans, of $17,500. While it is true that they encountered unforeseen circumstances during construction for which they were compelled to expend additional money, these sums are more akin to consequential damages neither contemplated at the time of the transaction, nor the product of active misrepresentation. The court finds that, on plaintiffs contract action, a sum due of $13,655 remains outstanding. On the defendant's counterclaim, defendant is due $17,500 for the diminution in fair market value of his property. Defendant counterclaimant is, therefore, entitled to recover $3,845 and judgment shall enter for that amount.